## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **STEVEN GRAY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:14-cv-01600-AJB** |
| **CAROLYN W. COLVIN,** | : | |
| *Acting Commissioner,* | : | |
| *Social Security Administration*, | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[1]

Plaintiff Steven Gray ("Plaintiff") brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social Security Act.[2]  For the reasons below, the undersigned **REVERSES** the final decision

---

[1]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entries dated 10/22/14 & 10/24/14).  Therefore, this Order constitutes a final Order of the Court.

[2]    Title II of the Social Security Act provides for federal Disability Insurance Benefits.  42 U.S.C. § 401 *et seq.*  Title XVI of the Social Security Act,

of the Commissioner **AND REMANDS** the case to the Commissioner for further

proceedings consistent with this order and opinion.

## I.    PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on February 12, 2010, alleging

disability commencing on December 30, 2009.  [Record (hereinafter "R") 14, 129-42].

Plaintiff's applications were denied initially and on reconsideration.

[*See* R77-85, 90-95].  Plaintiff then requested a hearing before an Administrative Law

Judge ("ALJ").  [R98-104].  An evidentiary hearing was held on June 21, 2012.

[R28-76].  The ALJ issued a decision on September 12, 2012, denying Plaintiff's

application on the ground that he had not been under a "disability" at any time through

the date of the decision.  [R11-27].  Plaintiff sought review by the Appeals Council, and

---

42 U.S.C. § 1381, *et seq.*, provides for Supplemental Security Income Benefits for the disabled.  Title XVI claims are not tied to the attainment of a particular period of insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).   In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.  *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims, and vice versa.

AO 72A
(Rev.8/8
2)

the Appeals Council denied Plaintiff's request for review on March 28, 2014, making the ALJ's decision the final decision of the Commissioner. [R2-8].

Plaintiff then initiated his lawsuit in this Court on May 27, 2014, seeking review of the Commissioner's decision. [*See* Doc. 1]. The answer and transcript were filed on September 17, 2014. [*See* Docs. 6, 7]. On October 22, 2014, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision, [Doc. 10]; on November 26, 2014, the Commissioner filed a response in support of the decision, [Doc. 13][3]; and on December 10, 2014, Plaintiff filed his reply brief in support of his petition for review, [Doc. 14]. The Court heard oral arguments on August 25, 2015. [*See* Doc. 18]. The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs, and the parties' oral arguments, and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

---

[3]       Pursuant to a consent order entered on November 21, 2014, [Doc. 12], the Commissioner's response brief was timely filed.

3

## II.    STATEMENT OF FACTS[4]

### A.    Background

Plaintiff was forty-two years old on September 12, 2012, the date of the ALJ's decision. [R23, 164].  He has a General Educational Development ("GED") credential, [R169], and past relevant work as a commercial cleaner, rental car driver, and lot attendant, [R73].  Plaintiff alleges that he has been unable to perform substantial gainful activity since December 30, 2009, due to large calluses on his right foot, whiplash, mental illness, and mental retardation.  [R16, 168].

### B.    Lay Testimony

#### 1.    Plaintiff

Plaintiff stated that he suffers from calluses on the bottom of his right foot and that the calluses limit his ability to be on his feet, so that he can stand and walk only about four or five hours at the most.  [R50].  He reported that the pain had become worse over time.  [R53].

Plaintiff testified that he had been living in an apartment by himself since about 2008.  [R53].  He said that he followed sports on and off and could read a newspaper

---

[4]    In general, the records referenced in this section are those deemed by the parties to be relevant to this appeal.  [*See* Docs. 10, 13, 14].

4

well enough to understand what happened during a game.  [R53-55].  He also stated that he would visit the library, where he checked out movies and looked at the newspaper and National Geographic.  [R56-57].

Plaintiff explained that in his job driving rental cars from one location to another, he did not use maps or written instructions, but instead had to follow another driver the first time he went to a new location.  [R46-47].

### 2.    *Plaintiff's Mother*

Plaintiff's mother testified that Plaintiff had learning disabilities but that she was not sure whether he had been in "Special Ed."  [R60].  She stated that Plaintiff was able to read and understand simple things in the newspaper.  [R64].  She also indicated that Plaintiff had trouble working because he would socialize or would take teasing seriously and feel picked on and also because he had multiple calluses on his foot. [R63, 66].  She testified that he needed help determining what is important (such as attending the hearing before the ALJ) and would remember things if he wrote them down.  [R66].  She stated that he had trouble with comprehension and that although he could follow simple instructions, "you will have to constantly check back with him." [R67].

AO 72A
(Rev.8/8
2)

Plaintiff's mother reported that Plaintiff lived with her continuously until 2004, when she got married.  [R59].  She reported that at first, he had lived in rooming houses but that she had since found him an apartment, which is less expensive and allows less opportunity for people to take advantage of Plaintiff.  [R59, 61].  She stated that he lives by himself but that she goes by and checks on him about three days a week to make sure he is wearing proper clothing, keeping his apartment clean, and following treatment prescribed for his foot.  [R59, 66-67].  She indicated that she pays his rent and utilities because Plaintiff does not fully understand the importance of paying them. [R59, 61].

She indicated that others would take advantage of Plaintiff by taking his food and underpaying him for work.  [R61-62].  She also reported that Plaintiff had been tricked into paying $2,000 he had received in a personal-injury settlement for a car that had been totaled and could not be registered or driven.  [R63-64].  Instead, he rides the bus to work or will be picked up.  [R68].  She stated that although Plaintiff does work, she did not think that he ever made enough money to do things like pay rent or other bills. [R69].

6

### C.    Administrative Records

In an undated work history report, Plaintiff stated that from 2000 through 2005, he worked in a warehouse, six hours per day, three days per week, earning $7.00 per hour; from 2005 through 2006, he worked through a temporary employment agency as a driver, six hours per day, three days per week, earning $7.00 per hour; and from 2009 through the date of the report, he worked as a driver for an automotive dealer, five hours per day, two days per week, earning $20.00 per day.  [R177-78, 180, 182, 206-09].  Earnings records show that Plaintiff earned at least $550 per year from 1987 to 2008, meeting the standard for "substantial gainful activity" in 1993 ($6,698.53), 1995 ($8,954.65), and 1998 ($6,920.70), but earning less than $4,000 in fourteen of the other years.  [R161].

In an adult function report dated March 24, 2010, Plaintiff reported that he lived on his own in an apartment and that on a typical day, he gets up in the morning, takes a shower, takes a lunch to work, works with others on the job, comes home, eats dinner, and plans for the next day.  [R194].  He stated that he has no problem with his personal care but needs reminders to take care of personal needs and grooming and to take medicine.  [R195-96].  He reported that he cleans and makes household repairs without help or encouragement.  [R196].  He also indicated that he does not drive because he

7

does not have a car and that he instead takes public transportation. [R197]. He reported that he can count change but cannot pay bills, handle a savings account, or use a checkbook because he does not have a job. [R197]. He stated that he likes to read and does so on a daily basis. [R198]. He also reported spending time with others at work and at church and indicated that he gets along with others very well. [R198-99].

**D.      School Records**

A school report dated December 12, 1979, when Plaintiff was nine years old and in the fourth grade, indicates that at that time, Plaintiff's reading level was at grade 1.9, his spelling level was at grade 3.4, and his math level was at grade 1.8. [R286]. It was noted that Plaintiff had received "Title I" reading and math services and that the school had also tried small groups and sending Plaintiff's parents extra materials so that they could help Plaintiff develop necessary skills. [R286].

On February 25, 1980, Mary V. Colburn, Resource Psychologist, evaluated Plaintiff for "apparent learning problems." [R285]. IQ testing revealed a verbal IQ of 77, a performance IQ of 93, and a full-scale IQ of 84, with reading at the 3.6 grade level and arithmetic at the 3.9 grade level. [R285]. The report states that Plaintiff had difficulty with language comprehension and auditory memory. [R285]. Plaintiff showed "fairly good problem-solving skills with some performance materials but not

8

others," "[d]id best when he merely had to copy," and performed worst when he had to organize information independently. [R285]. It was noted that Plaintiff had relatively strong visual-motor perceptual skills, good fine-motor control, and clear speech articulation but that his thinking was "extremely concrete, with almost no ability to relate one isolated thing or event with another in order to form an overall concept which would help him understand and organize" and that this inability to understand affected his emotional maturity and made it difficult for him to remember things he was told. [R285]. It was recommended that Plaintiff undergo further evaluation for memory, comprehension, written expression, reading, and math, in order to determine the appropriateness of placement in learning-disabled classes. [R285].

Minutes from an in-school meeting taking place on April 2, 1980, indicate that Plaintiff was performing below expectations in the classroom. [R262]. It was recommended that Plaintiff receive learning-disability resources, and an individualized education plan ("IEP") was to be completed in two weeks. [R262].

A report entitled Review of Evaluation Data, dated April 14, 1980, indicates that Plaintiff had moderate learning disabilities and his performance was considered "below average," but he was not considered to be mentally retarded. [R275]. It was noted that there was a severe discrepancy between Plaintiff's intellectual ability and his

9

achievement in the areas of oral and written expression, basic reading, math reasoning, and reading comprehension.  [R277].

Minutes from a school meeting held on January 18, 1983, indicate that Plaintiff's teachers were of the opinion that he was functioning below grade level (six) on comprehension and skills.  [R279].  It was also noted that Plaintiff was having some difficulty with spelling but that his teacher felt he could do better if he studied.  [R279]. One teacher said that she felt Plaintiff could do seventh grade work, but that he did not because he did not complete work, and he was therefore functioning at a fifth-grade level.  [R279].  Two of his teachers stated that Plaintiff needed to be pushed constantly to perform and that he could use all the help he could get.  [R279].  The teachers recommended that Plaintiff continue to participate in the school's program for learning-disabled students.  [R281].  Plaintiff's mother stated, however, that she saw no improvement and wanted Plaintiff out of the resource class.  [R279].  Plaintiff was then removed from the learning-disabled program over his teachers' objections.  [R281].

In the spring of 1987, when Plaintiff was in the eleventh grade, he failed to pass the reading portion of the Georgia Basic Skills Test.  [R348].  In October 1988, when he was in the twelfth grade, he again failed to pass the reading portion of the test. [R348].  In June 1989, Plaintiff had a grade point average of 0.906, was in the bottom

10

one percent of his class (288 of 291), and had only 277.5 of the 315 credits he needed to graduate.  [R347].

A letter from the school district's record center, dated April 19, 2011, indicates that Plaintiff was not enrolled in a "Special Education program" and that his file therefore did not contain an IEP or Psychological Report.  [R344].  Records also indicate that he was promoted each year.  [R271].

### E.    Medical Records

From March through May 2009, Plaintiff received therapy from Wendy Mitchell, M.D., for injuries to his shoulder, neck, and low back that he sustained in a car accident.  [R352-404].  By May 2009, he reported that he was no longer in pain and was not taking pain medication, and he was released to resume his normal activities. [R352].

On November 20, 2009, Camp Creek Urgent Care treated Plaintiff for an injury to his right thumb.  [R293-95].

On December 30, 2009, Plaintiff was evaluated by Carolyn N. Johnson, Ph.D., a licensed clinical psychologist, upon his mother's request.  [R296].  The stated purpose of the evaluation was to assess Plaintiff's current level of functioning and to provide

11

information regarding potential interventions, including his eligibility for various community-based services.  [R296].

During the evaluation, Plaintiff reported that in high school, math was his worst subject, and he struggled with science.  [R297].  He denied having behavioral problems in school and stated that although he did attend summer school, he was never retained in any grade.  [R297].  He also denied ever being placed in special education.  [R297]. He indicated that he had been the subject of a rather hostile school environment in the twelfth grade, resulting in his leaving school and earning a GED.  [R297].  Although he acknowledged a possession charge that took place "a couple months ago," he stated that he used marijuana occasionally since high school but never developed a regular pattern and had not used in the couple of months prior to the evaluation.  [R297].

Plaintiff's mother expressed concern that Plaintiff has a difficult time realizing what is important and that he often tries to handle things himself without asking for help, which sometimes results in others taking advantage of him.  [R298-99].  She provided the example of the car Plaintiff purchased, explaining that it was an exercise of poor judgment because Plaintiff did not receive the title and could not afford insurance.  [R299].  She reported that Plaintiff seems to become confused easily, mixing aspects of different situations and not being able to stay focused on one thing.

12

[R299].  She also stated that Plaintiff could not manage his money, he could not budget for bills, and although Plaintiff was living on his own, she and her husband were paying for Plaintiff's apartment.  [R299].  She described that Plaintiff does not seem to have motivation to work, explaining that he does not prioritize getting a job and does not seem to realize that he needs to have one in order to pay his rent.  [R299].  She also questioned whether Plaintiff has the social skills to maintain a job, as he tends to become paranoid and feels as if people are out to get him, tends to take things too seriously and personally, and often takes things the wrong way.  [R299].

Administration of the Wechsler Adult Intelligence Scale–Fourth Edition ("WAIS-IV") revealed a full-scale IQ score of 69, which was within the Extremely Low range of intellectual functioning and placed Plaintiff at the second percentile when compared to scores earned by others his age.  [R299-300].  Plaintiff's scores on the Verbal Comprehension and Working Memory subscales fell in the Extremely Low range, his score on the Perceptual Reasoning scale fell in the Borderline range, and his Processing Speed subscale fell in the Low Average range.  [R300].  Dr. Johnson opined that, overall, Plaintiff's intellectual functioning displayed "significantly below average levels of functioning in most areas."  [R300].

13

Administration of the Wechsler Individual Achievement Test–Second Edition (Abbreviated) resulted in reading and spelling scores in the Extremely Low range and an arithmetic score in the Low Average range.[5]  [R300].  Dr. Johnson stated that Plaintiff appeared to have "passable skills with respect to mathematics and can perform simple calculations, though higher skills such as budgeting and financial planning may be beyond his capabilities."  [R300].  She also noted that Plaintiff's verbal skills were "quite low, which may make things more difficult in terms of maintaining communication in social and professional settings."  [R300].

Dr. Johnson also interviewed Plaintiff's mother and stepfather with the Vineland-II Adaptive Behavior Scales in order to provide a measure of Plaintiff's adaptive functioning.  [R301].  Dr. Johnson opined that the results indicated that Plaintiff had "significant adaptive deficits"; was functioning in the Low range with regard to communication, daily living skills, and socialization; and had minimal ability to maintain social relationships with awareness as opposed to naivete.  [R301].  She noted that Plaintiff's area of strength was in daily living skills, such as managing his own residence, attending to his personal needs, and moving with relative independence in

---

[5]     Plaintiff's Word Reading was judged to be at the 4:7 grade equivalent, Numerical Operations at the 6:8 grade equivalent, and Spelling at 4:2 grade equivalent. [R300].

14

the community.  [R301].  She estimated that Plaintiff was below the first percentile with respect to overall development of adaptive skills as compared to others his age, evidencing limitations consistent with a diagnosis of Mild Mental Retardation.  [R301].

Dr. Johnson diagnosed Mild Mental Retardation; indicated that financial issues, erratic employment, community living skills, and access to health care and community services could affect Plaintiff's diagnosis, treatment, and prognosis; and assigned a GAF score of 45.[6]  [R302-03].  She also recommended that Plaintiff receive some type of community support, as she found him able to attend to his basic needs but unable to support himself, maintain a job, or be financially independent from his mother, and vulnerable to poor judgment and the influence of others who may not have his best interests in mind.  [R303].  She suggested that he be evaluated for a work-training program and consider applying for Social Security disability benefits.  [R303].

In 2010, Plaintiff presented to John Ross, M.D., with calluses or calcifications and pin-prick pain sensations in his right foot.  [R406-09].  Treatment consisted of

---

[6]     The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000).  A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.* at 34.

AO 72A
(Rev.8/8
2)

salicylic acid and Lotrisone cream to dry and then remove the calluses.  [R406-09].

Plaintiff was diagnosed with tinea pedis[7] and calculi[8] and was told to wear flip flops.

[R407].

On June 5, 2010, reviewing physician Douglas Robbins, Ph.D., completed a

Psychiatric Review Technique ("PRT") form and a Mental Residual Functional

Capacity Assessment ("Mental RFC Assessment").   [R304-18].   In the PRT,

Dr. Robbins opined that Plaintiff had moderate restrictions in activities of daily living,

moderate difficulties in maintaining social functioning, and moderate difficulties in

maintaining concentration, persistence, or pace.  [R312].

In the Mental RFC Assessment, Dr. Robbins opined that Plaintiff was moderately

limited in his ability to: understand, remember, and carry out detailed instructions;

maintain attention and concentration for extended periods; sustain an ordinary routine

without special supervision; interact appropriately with the general public; accept

instructions and respond appropriately to criticism from supervisors; respond

_____

[7]       Tinea pedis is also commonly known as Athlete's Foot.  MedlinePlus,
Athlete's Foot,  http://www.nlm.nih.gov/medlineplus/athletesfoot.html (last visited
8/6/15).

[8]       A calculus is an aggregation or formation of solid material, usually
composed of salts of organic or inorganic acids.  *PDR Med. Dictionary* 260
(1st ed. 1995).

AO 72A
(Rev.8/8
2)

appropriately to changes in the work setting; and set realistic goals or make plans independently of others. [R316-17]. Dr. Robbins concluded that Plaintiff is able to understand, remember, and follow simple one-to-two-step procedures; is able to maintain attention/concentration for two-hour periods to complete simple tasks with minimal supervision; would be able to work an eight-hour day with "all regularly afforded breaks [and] rest periods"; and would be able to maintain schedules and attendance. [R318]. He also opined that Plaintiff's interactions with the general public should be limited, supervision and criticism should be of a supportive nature, and changes in the work setting should be infrequent and introduced gradually, and that while Plaintiff is capable of setting simple, short-term work goals, he will need assistance with goals that are more complex, detailed, or long term. [R318].

On December 22, 2010, Plaintiff underwent a consultative evaluation with Valerie McAdams, Psy. D. [R322]. Dr. McAdams conducted a clinical interview and mental-status examination; reviewed Plaintiff's Adult Disability Report and Dr. Johnson's report; acknowledged that Plaintiff alleged that he was impaired by large calluses on his right foot, mental illness, and mental retardation; and interviewed Plaintiff's mother. [R322-23]. Plaintiff was interviewed separately from his mother,

17

according to his preference, and he was also administered the Mini Mental-State Examination ("MMSE").[9]  [R323-24].

Plaintiff reported he had held a variety of jobs and never been fired, and he was currently employed part-time as a driver.  [R322].  He reported he resided alone in an apartment since 2007; he required no assistance with meal preparation, household tasks, shopping, or managing funds; and he participated in a wide range of activities, including exercising, watching television, spending time with friends, going to movies, and working.  [R323].

Plaintiff's mother reported to Dr. McAdams that Plaintiff is "slow" but did not receive special education or repeat any grades.  [R322].  She also indicated that Plaintiff believes that other workers take advantage of him by doing things like paying him only $10 for eight hours of work.  [R322-23].  She also reported that she helps to manage Plaintiff's finances, which include $300 in monthly income.  [R323].

Dr. McAdams observed that Plaintiff did not appear to overstate his symptoms and that "there was no real clear reason why he has applied for disability assistance."

---

[9]       The MMSE is the most common neurocognitive test.  It considers a person's appearance, orientation, attention span, recent and past memory, language function, and judgment, and is scored from 0 to 30.  MedlinePlus, Mental Status Testing, http://www.nlm.nih.gov/medlineplus/ency/article/003326.htm (last visited 8/5/15).  Plaintiff obtained a score of 28.  [R324].

18

[R323].  She also remarked that Plaintiff had no history of mental-health treatment and that he failed to mention a possession-of-marijuana charge reported in Dr. Johnson's December 2009 opinion.  [R323].

Upon mental status examination, Dr. McAdams found that Plaintiff's insight into his functioning and judgment appeared to be fair, that his reasoning skills appeared to be logical, and that he had no problems with sustained attention or concentration.  [R323].  She also noted that Plaintiff was alert and oriented to person, time, place, and situation, and had no difficulty recalling three words after a brief period of time or spelling the word "world" backwards.  [R324].

Dr. McAdams opined that Plaintiff's actual presentation, work history, and educational experience appeared to suggest higher functioning than noted on formal testing in the previous examination and that, given Plaintiff's speech and presentation, his intellectual functioning appeared to be in the borderline range.  [R323-24].  She further stated that although Plaintiff may be a slow learner, "given his ability to maintain employment over the years, live alone, and manage [activities of daily living] fairly well, mental retardation is not suspected."  [R324].  She opined that Plaintiff is able to understand, remember, and follow simple instructions; has no obvious deficits with memory functioning; does not appear to be easily overwhelmed by minor

19

stressors; and does not appear to be prone to interpersonal issues in the workplace. [R324]. Dr. McAdams did find, however, that Plaintiff "may require assistance managing disability funds, if awarded." [R324].

On February 9, 2011, reviewing physician Horace Lukens, Ph.D., completed a PRT and Mental RFC Assessment. [R325-41]. In the PRT, Dr. Lukens opined that Plaintiff had moderate restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. [R335].

In the Mental RFC Assessment, Dr. Lukens, like Dr. Robbins, opined that Plaintiff was moderately limited in his ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; interact appropriately with the general public; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. [R339-40]. Unlike Dr. Robbins, Dr. Lukens found that Plaintiff was not significantly limited in his ability to accept instructions and respond appropriately to criticism from supervisors but that he was moderately limited in his ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; make simple work-related decisions; complete

20

a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.   [R339-40].   Dr. Lukens concluded that Plaintiff could understand and remember simple instructions, maintain attention and concentration, and perform routine, repetitive tasks for two-hour blocks during an eight-hour day; was capable of interacting appropriately with coworkers and supervisors at a basic level; and was able to adapt adequately in order to complete simple work tasks without significant interruption from psychologically based symptoms.  [R341].

### F.   Vocational Expert Testimony

The vocational expert ("VE") testified that a person of Plaintiff's age, education, and vocational profile, who was capable of light work with a sit-stand option and was limited to simple tasks (defined as working at skill-levels one or two), no reading, and occasional superficial contact with the general public and co-workers, could not perform Plaintiff's past work but could perform the light unskilled jobs of garment sorter, press operator, or assembler II.  [R72-74].

### III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

21

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2.    The claimant has not engaged in substantial gainful activity since December 30, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: borderline intellectual functioning, and a history of marijuana abuse (20 CFR 404.1520(c) and 416.920(c)).

. . .

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant must be afforded a sit/stand option, and is limited to jobs with no reading requirement.  The claimant retains the residual functional mental capacity to perform simple tasks (work at skill levels 1-2), and occasional superficial contact with the general public and coworkers.

. . .

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

22

. . .

7.    The claimant was born on August 2, 1970 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

. . .

11.   The claimant has not been under a disability, as defined in the Social Security Act, from December 30, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

[R16-22].

The ALJ explained that he had considered Plaintiff's mental impairment under the requirements of Listing 12.05 (Mental Retardation),[10] which, the ALJ noted, "refers

---

[10]    On August 1, 2013, while Plaintiff's appeal of the ALJ's decision was before the Appeals Council, the Social Security Administration amended Listing 12.05 to replace the words "mental retardation" with "intellectual disability" because of the

to significantly subaverage general intellectual functioning with deficits in adaptive functioning" where "the evidence demonstrates or supports onset of the impairment before age 22," but found that Plaintiff's condition did not meet or medically equal the listing because:  Plaintiff did not appear to have deficits in functional adaptations, as he has lived alone since 2008, can read the newspaper to follow sports, goes to the library to check out DVDs and to look at National Geographic, and "has earned significant sums at jobs in every year from 1987 to 2008" and at substantial gainful activity level or above in several years; educational records from before the age of twenty-two indicate that Plaintiff was considered learning disabled, not mentally retarded, was considered by teachers to be working below his potential in mainstream classes (*e.g*., World History II, basic algebra, consumer math, biology, math level 3, development of U.S. democracy, matter and measurement, political behavior), was not in special education classes, was seen as functioning in the low-average range of intelligence while in school, and achieved a GED after leaving school, [R261-86]; and

_____

negative connotations associated with the term "mental retardation." *See* 78 Fed. Reg. 46,499, 46,501.  The change "does not affect the actual medical definition of the disorder or available programs or services." *Id*. at 46,500.  While the undersigned is certainly sympathetic to the concerns underlying the amendment, this R&R uses the term "mental retardation" in order to avoid inconsistency with the terminology used in the medical records, by Plaintiff, and by the ALJ.

24

while the psychological evaluation from December 30, 2009, found mild mental retardation, the considerations noted above, along with the extensive list of daily activities Plaintiff reported at that examination, indicates that Plaintiff is performing more in line with the psychological consultative examination held December 22, 2010, which found intellectual functioning to be within the borderline range, with mental retardation not suspected given Plaintiff's functional abilities, [R296-303, 321-24]. [R17].

The ALJ further explained that even if the above issues had been resolved in Plaintiff's favor, the required level of severity for the disorder was not met because the requirements in paragraphs A, B, C, or D were not satisfied. [R17]. As to paragraph C, the determination Plaintiff challenges here, the ALJ found that the requirements of that paragraph were not met because although Plaintiff has a valid verbal, performance, or full-scale IQ of 60 through 70, he does not have a physical or other mental impairment imposing an additional and significant work-related limitation of function.

The ALJ also explained why he did not fully credit Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms. [R18-22]. First, the ALJ found that Plaintiff's testimony as to a very limited lifestyle with little physical exertion and limited mental capacity was not in keeping with the findings

AO 72A
(Rev.8/8
2)

Case 1:14-cv-01600-AJB   Document 19   Filed 09/22/15   Page 26 of 51


reported in his school records and by his treating physicians: Plaintiff's lowest IQ testing before age twenty-two was a verbal IQ score of 77, in the borderline range; Dr. McAdams reported that Plaintiff's activities of daily living and presentation were in the borderline range; Plaintiff's academic records indicate that he was learning disabled but not considered mentally retarded, that he was considered by teachers to be working below his potential in mainstream classes, that he was not enrolled in special education classes, and that he earned a GED after leaving school, [R261-86]. [R20]. Second, the ALJ found that Plaintiff's mother was partially credible as to his having poor money management skills, needing her help and occasional funding, and being cheated by others, but that Plaintiff's own reports of his activities of daily living make his functioning appear to be above the mental-retardation range: he has lived alone since 2008, can read the newspaper to follow basketball, goes to the library to check out DVDs and look at National Geographic, and has been able to earn wages at various jobs every year. [R20-21]. Third, the ALJ stated that while he accepted that the psychological evaluation included a valid full-scale IQ score in the mental-retardation range, he gave more weight to the medical opinion and assessment of Dr. McAdams than to other testing and, as discussed above, did not find the mental-retardation listing to be met. [R21]. Fourth, the ALJ stated that he gave "significant weight" to opinions

26

(Rev.8/8
2)

of Drs. Lukens and Robbins because he found them to be "fully supported by the record." [R21]. Fifth, the ALJ found that there were "no real physical ailments" and that past substance abuse was not material, as Plaintiff had been able to work despite any such abuse. [R21].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing

AO 72A
(Rev.8/8
2)

the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age,

28

education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superceded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

29

## V.     SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance."  *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as

30

a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff alleges that the ALJ erred by failing to include limitations in the RFC to accommodate his slow learning ability or need for additional supervision and by making conflicting and erroneous findings that led to an unfounded conclusion that Listing 12.05C was not met.  [Doc. 10 at 10-24].  The Court addresses each allegation below.

31

**A.    Limitations to the RFC**

The RFC finding limits Plaintiff to non-reading jobs that require only occasional superficial contact with the general public and coworkers and require him to perform only simple tasks, defined as work at skill levels one and two.  [R18].  Plaintiff argues that the RFC is deficient because it does not include any limitation regarding his slow learning ability or need for additional supervision.  [Doc. 10 at 10-12].

**1.    *"Slow Learner"***

Plaintiff argues that Dr. McAdams found that Plaintiff is a slow learner, and he contends that he therefore requires special attention to learn each new work task. [Doc. 10 at 11 [citing R324]].  He asserts that because the ALJ gave great weight to Dr. McAdams's opinion, the ALJ should have crafted the RFC to accommodate the limitation.  [Doc. 10 at 11].

The contention that the ALJ did not address or include appropriate limitations consistent with Dr. McAdams's report is without merit.  As the Commissioner points out, Dr. McAdams did not herself make a finding that Plaintiff was a "slow learner," but instead used the phrase in the context of acknowledging Plaintiff's mother's report that he was "slow."  [Doc. 13 at 7-8 [citing R322-24 ("He may[]be a slow learner, but . . . .")]].  Additionally, as noted by the ALJ, Dr. McAdams observed that Plaintiff's

AO 72A
(Rev.8/8
2)

reasoning skills appeared logical, he was well oriented and had no obvious deficits with memory functioning, and his insight into functioning and judgment seemed fair, and she opined that Plaintiff had no problems with sustained attention or concentration and that he was able to understand, remember, and follow simple instructions. [R20 [citing R322-24]]. Thus, the Court finds no basis for a determination that the RFC does not accommodate the limitations found by Dr. McAdams.

### 2. *Special Supervision*

Plaintiff points out that both of the reviewing physicians found that he is moderately limited in his ability to sustain an ordinary routine without special supervision, [R316-18, 339-41], and he argues that his work history—particularly his history of needing to follow another driver the first time he drove to a new location because he did not use maps or written instruction, [R46-47]—supports this need for additional or special supervision. [Doc. 10 at 11]. He contends that because the ALJ gave significant weight to the reviewing opinions, the RFC should include a limitation reflecting Plaintiff's need for special supervision. [*Id.* at 11-12].

The Commissioner, in response, concedes that both reviewing physicians checked boxes on the Mental RFC Assessment form indicating that Plaintiff was moderately limited in his ability to sustain an ordinary routine without special

AO 72A
(Rev.8/8
2)

supervision.  [Doc. 13 at 9 [citing R316, 339]].  The Commissioner points out, however, that Dr. Robbins opined in his functional capacity assessment that Plaintiff was able to maintain attention and concentration for two-hour periods to complete simple tasks with minimal supervision, [R318], and that Dr. Lukens did not elaborate on any limitations regarding Plaintiff's supervision in his functional capacity assessment but did opine that Plaintiff could understand and remember simple instructions, maintain attention and concentration, and perform routine tasks for two-hour blocks in an eight-hour day, [R341].  [Doc. 13 at 9].  The Commissioner contends that the RFC is therefore consistent with the opinions of the reviewing physicians.  [*Id*. at 10].

To the extent that Plaintiff's argument regarding additional limitations for special supervision rests on Plaintiff's alleged inability to receive written instructions, the Court finds that such limitation was implicitly captured in the restriction to jobs with no reading requirements.  [*See* R18].  It does, however, appear that although the ALJ stated that he gave "significant" weight to the opinions of the reviewing physicians, he failed to reconcile the RFC to the portions of the opinions in which the reviewing physicians found that Plaintiff is moderately limited in his ability to sustain an ordinary

34

routine without special supervision.  [*Compare* R18 (RFC) *with* R316, 339 (reviewers' opinions)].

First, the Court is not persuaded by the Commissioner's suggestion that the comments in the functional capacity assessment so minimize the "special supervision" opinions that the ALJ need not have addressed them.  It is uncontroverted that both reviewing physicians found that Plaintiff was moderately limited in his ability to sustain an ordinary routine without special supervision.  [R316, 339].  That Plaintiff may have an ability to manage simple tasks with minimal supervision for two-hour blocks says nothing about his ability to sustain such work with only minimal supervision over the course of a eight-hour work day or a forty-hour work week. [*See* R317, 341].

Second, to presume that the comments the reviewing physicians wrote in their functional capacity assessments were intended to address Plaintiff's moderate limitation in his ability to sustain an ordinary routine without special supervision would amount to an impermissible post hoc rationalization.  Dr. Lukens's comments make no further reference to Plaintiff's need for supervision, [R341], and while Dr. Robbins's comments do refer to Plaintiff's need for supervision, a "moderate" limitation is contrary to a need for "minimal" supervision, and neither Dr. Robbins nor the ALJ

35

acknowledged the conflict or made any attempt to resolve it, [R318].  It would be improper for the Court—or the Commissioner—to draw post hoc conclusions from the medical evidence.  *See Baker v. Comm'r of Soc. Sec.*, 384 Fed. Appx. 893, 896 (11th Cir. June 23, 2010) ("If an action is to be upheld it must be upheld on the . . . bases articulated in the agency's order.") (citing *FPC v. Texaco, Inc.*, 417 U.S. 380, 397 (1974)); *Patterson v. Chater*, 983 F. Supp. 1410, 1413 (M.D. Fla. 1997) (holding that it is the duty of the ALJ—and not the court—to draw inferences from the evidence and resolve conflicts in the evidence); *see also Hendrix ex rel. S.F.H. v. Astrue*, No. 1:12-cv-2086, 2013 WL 4718223, at *16 (N.D. Ga. Sept. 3, 2013) (Duffey, J., *adopting* Scofield, M.J.) ("An ALJ may not arbitrarily pick and choose facts from the evidence to support his conclusions without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence.") (citing *Marbury v. Sullivan*, 957 F.2d 837, 839-41 (11th Cir. 1992) (per curiam)).

Thus, because the reviewing physicians found that Plaintiff was moderately limited in his ability to sustain an ordinary routine without special supervision, and the ALJ failed to explain why those opinions were not accommodated in the RFC despite the "significant weight" he claimed to have accorded them, remand is required.

AO 72A
(Rev.8/8
2)

**B.      Listing 12.05C**

Plaintiff also takes issue with the ALJ's determination that he did not meet Listing 12.05C. [Doc. 10 at 12-24]. The Listing of Impairments in Appendix 1 of Subpart P describes for each of the major body systems impairments that are considered to be severe enough to render an individual disabled. 20 C.F.R. § 404.1525(a). As noted above, at the third step of the five-step disability evaluation process, the ALJ must determine whether a claimant's impairments meet or equal one of the Listings and meet the duration requirement.[11] 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant meets or equals a Listing, then he is disabled. *Id.*

A claimant meets a Listing if he has a diagnosis included in the Listings and provides medical reports documenting that his conditions meet the specific criteria in the Listings. *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (per curiam) (citing 20 C.F.R. § 404.1525(a)-(d)). A claimant equals a Listing if the medical findings show an impairment at least equal in severity and duration to the criteria set out in the Listing. *Wilson*, 284 F.3d at 1224. Where a claimant alleges that he has an impairment that meets or equals a Listing, he bears the burden of presenting evidence

---

[11]      An impairment "must have lasted or must be expected to last for a continuous period of at least 12 months" to meet the duration requirement. *See* 20 C.F.R. § 404.1509.

37

showing how his impairment meets or equals the Listing. *Wilbon v. Comm'r of Soc. Sec.*, 181 Fed. Appx. 826, 828 (11th Cir. May 18, 2006) (per curiam) (citing *Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987) (per curiam)).

Listing 12.05 (Mental Retardation) refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period—that is, the evidence demonstrates or supports onset of the impairment before age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The required level of severity for subsection C is met when the claimant has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* Thus, a claimant meets Listing 12.05C if he shows: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22 ("adaptive-deficit requirement"); (2) a valid IQ score between 60 and 70 ("IQ-score requirement"); and (3) other physical or mental impairments that impose significant work-related limitations ("other-impairment requirement"). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.00A, 12.05C; *Gibson v. Astrue*, No. 1:09-cv-677-AJB, 2010 WL 3655857, at *9 (N.D. Ga. Sept. 3, 2010) (Baverman, M.J.); *see also Pettus v. Astrue*, 226 Fed. Appx. 946, 948 (11th Cir. Apr. 5, 2007) (per curiam) (citing *Crayton*

38

*v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).  "[A] valid IQ score need not be conclusive of mental retardation where the score is inconsistent with other evidence in the record on the claimant's daily activities and behavior."  *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992); *accord Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 (11th Cir. Aug. 10, 2006).

Although not expressly stated, the parties appear to agree that Plaintiff satisfies the IQ-score requirement because Plaintiff has a valid full-scale IQ score of 69. [Doc. 10 at 13 [citing R21, 299]; Doc. 13 at 13].  Plaintiff contends, however, that the ALJ's determination that he did not meet the adaptive-deficit requirement or the other-impairment requirement was not supported by substantial evidence because "the ALJ misstated and overstated some of the evidence" and because the ALJ's conclusion regarding the Listing contradicts some of his own findings.  [Doc. 10 at 12-24].

As to the adaptive-deficit requirement, Plaintiff first reviews the evidence that would have supported a determination in his favor.  [Doc. 10 at 14-17, 20-21].  Second, he argues that the ALJ erred by misstating and overstating evidence in support of his determination that Plaintiff did not suffer from any adaptive deficits.  [*Id.* at 17-20]. Third, Plaintiff contends that the ALJ's reliance on the opinion of Dr. McAdams was unfounded.  [*Id.* at 21-22].  Fourth, he asserts that there is no evidence that his

39

functioning and behavior conflicts with the diagnosis of mild mental retardation. [*Id.* at 23]. Finally, he goes on to argue that the fact that the ALJ limited the RFC to non-reading positions, limited contact with the public and co-workers, and a light exertional level with a sit/stand option conflicts both with the ALJ's determination that Plaintiff's difficulties with reading did not amount to a deficit in adaptive functioning and with his determination that Plaintiff did not have other physical or mental impairments that impose significant work-related limitations. [*Id.* at 18, 23-24].

The undersigned finds no grounds for reversal in any of these arguments. First, it is well established that an ALJ is not required to find in the claimant's favor simply because there is record evidence that provides support for the claimant's allegations. As the Eleventh Circuit has stated, "Even if the evidence preponderates against the Commissioner's findings, [the court] must affirm if the decision reached is supported by substantial evidence." *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam) (internal quotation marks omitted). Thus, the fact that portions of the record evidence support Plaintiff's allegations does not require reversal.

Second, for similar reasons, the Court is unpersuaded that the ALJ impermissibly relied on, misstated, or overstated evidence in support of his determination that Plaintiff did not suffer from any adaptive deficits. Plaintiff contends that the ALJ improperly

40

relied on the fact that Plaintiff lived alone since 2008 in the face of evidence that he was financially dependant on others; found that Plaintiff could read the newspaper to follow sports despite evidence that he never passed the Georgia Basic Skills Test for reading in any year; found that Plaintiff earned "significant sums" at jobs every year from 1987 through 2008, although the evidence showed that he only earned at the substantial gainful activity level three of those years; and relied on a letter stating that Plaintiff was not in special education classes despite other evidence showing that he attended small groups for reading and math in 1979 through 1982 and stopped only upon his mother's insistence.  [*Id.* at 17-20].

Review of the ALJ's opinion and the record evidence shows, however, that each of the factual findings Plaintiff challenges is supported by substantial evidence. Despite Plaintiff's suggestion to the contrary, the ALJ did not presume that Plaintiff had lived completely independently since 2008 but instead expressly took into consideration Dr. Johnson's observation that Plaintiff has not been able to hold a steady, full-time job to the extent that he could consistently support himself and Plaintiff's mother's statements that Plaintiff had poor money management skills, needed her help and occasional funding, and was often cheated by others.  [R19-21]. Similarly, while Plaintiff implies that the ALJ improperly presumed that Plaintiff was

41

employed in substantial gainful activity every year from 1987 through 2008, review of the decision reveals that the ALJ expressly recognized that Plaintiff earned at the substantial gainful activity level in only three of those years.  [R17].  The fact that Plaintiff never passed the Georgia Basic Skills Test for reading in any year does not undermine the ALJ's decision to credit Plaintiff's testimony that could read the newspaper to follow sports, particularly in light of the fact that Plaintiff also earned a GED after he stopped attending high school.  [R17].  Additionally, review of the record supports the ALJ's decision to credit the letter stating that Plaintiff had never been placed in special education classes, as the record indicates that the school did testing in which it found Plaintiff to be learning disabled and not mentally retarded, teachers felt Plaintiff was performing below his potential, the school provided Plaintiff with additional resources due to learning disabilities, the school promoted him every year, and both Plaintiff and his mother repeatedly reported that he had never been placed in special-education classes.  [R17, 60, 169, 261-64, 271-86, 322, 344].  Even if the Court disagreed with the ALJ's assessment of the evidence, it is not within the Court's power to re-decide the facts. *See Werner v. Comm'r of Soc. Sec.*, 421 Fed. Appx. 935, 939 (11th Cir. Mar. 21, 2011) (per curiam) ("The question is not, as [the plaintiff] suggests, whether ALJ could have reasonably credited his testimony, but whether the ALJ was

42

clearly wrong to discredit it."); *Dyer*, 395 F.3d at 1210 (noting that a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner).  It would therefore be improper to reverse the ALJ's decision simply because he could reasonably have interpreted the evidence differently.

Third, the Court is unconvinced by Plaintiff's argument that the ALJ impermissibly relied on Dr. McAdams's opinion.  Plaintiff points out that Dr. McAdams did not perform psychological testing and asserts that some of the information Dr. McAdams received was inaccurate or conflicting, such statements indicating that Plaintiff had not been placed in special education classes and Plaintiff reporting that he managed his own finances, while his mother said he required assistance.  [Doc. 10 at 22].  Plaintiff argues that Dr. McAdams's opinion therefore relied on less information and less-accurate information than Dr. Johnson's opinion relied on and that, as a consequence, the ALJ erred in crediting Dr. McAdams's opinion over Dr. Johnson's.  [*Id.*].

Notably, Plaintiff does not provide any authority that might supply grounds for a determination that the ALJ was not permitted to credit Dr. McAdams's report over Dr. Johnson's as a matter of law.  [Doc. 10 at 21-22; Doc. 14 at 7-8].  Moreover, the argument appears to yet another invitation to the Court to impermissibly second-guess

43

the ALJ's assessment of the facts where the ALJ in fact based his evaluation upon substantial evidence.  Contrary to Plaintiff's representations, the record shows that: while Dr. McAdams did not perform IQ testing, she did perform an MMSE, [R324]; both Dr. McAdams and Dr. Johnson were told that Plaintiff was never placed in special education, [R297, 322]; and Dr. McAdams reviewed Dr. Johnson's report and therefore knew about Plaintiff's mother's report regarding Plaintiff's financial support and the results of the cognitive testing Dr. Johnson conducted, [R299-302, 322].  Thus, it does not appear that Dr. Johnson was privy to more information than Dr. McAdams.

Additionally, the ALJ supplied a reasonable explanation for crediting Dr. McAdams's findings over Dr. Johnson's when he found that Plaintiff's history of marijuana use was a severe impairment and noted that it was thought to relate to a lack of motivation reported in Dr. Johnson's examination, [R16, 20], and he explained that Plaintiff's own reports of his activities of daily living, which included reports that he does not require assistance with meal preparation, household tasks, or shopping, he spends his day exercising, watching television, working out, and walking, he works three day a week, and he enjoys artwork, movies, and dining out, called into question the accuracy of Dr. Johnson's mental-retardation diagnosis, [R20].  For these reasons,

AO 72A
(Rev.8/8
2)

the Court therefore finds no grounds for reversal in the ALJ's decision to credit Dr. McAdams's opinion over that of Dr. Johnson.

Fourth, it is simply not true that the record does not contain evidence that Plaintiff's functioning and behavior conflicts with the diagnosis of mild mental retardation. For example, the record indicates that during Dr. McAdams's examination of Plaintiff in December 2010, Plaintiff reported that he does not require assistance with meal preparation, household tasks, or shopping, he spends his day exercising, watching television, working out, and walking, he works three days a week, and he enjoys artwork, movies, and dining out; upon evaluation of Plaintiff's mental status, Dr. McAdams observed that he was well oriented and had no obvious deficits with memory functioning, his insight into functioning and judgment seemed fair, and he appeared to have no aberrant behavior or emotional functioning; Dr. McAdams opined that Plaintiff's past marijuana use related to his reported lack of motivation noted in a previous exam, that she could find no clear reason why Plaintiff had applied for disability assistance, as he also had no problems with sustained attention or concentration, that Plaintiff was able to understand, remember, and follow simple instructions, that Plaintiff did not appear to be overwhelmed by minor stressors, and that his functioning was within the borderline range; and Dr. McAdams noted that

45

while Plaintiff may be a slow learner, given his ability to maintain employment over the years, live alone, and manage activities of daily living fairly well, mental retardation was not suspected. [R321-24]. The record also shows that while in school, Plaintiff was considered to be learning disabled but not mentally retarded, and that he ultimately went on to earn a GED. [R169, 275]. Plaintiff also reported to the ALJ that he has lived in an apartment by himself since 2008, can read the newspaper well enough to follow basketball, and goes to the library to check out DVDs and look at National Geographic. [R53-56]. Additionally, there is evidence that Plaintiff worked and earned a non-trivial amount of money each year from 1987 through 2008. [R161]. Together, this evidence certainly constitutes "more than a scintilla" of evidence in conflict with the diagnosis of mild mental retardation. *See Bloodsworth*, 703 F.2d at 1239.

Plaintiff's fifth argument—that the limitations the ALJ imposed in the RFC suggest both a deficit in adaptive functioning and "a physical or other mental impairment imposing an additional and significant work-related limitation of function"—is also unconvincing. In essence, Plaintiff argues that because the ALJ crafted an RFC limiting him to simple, light work with a sit/stand option, no reading requirement, and only occasional superficial contact with the general public and coworkers, Plaintiff therefore *must* have suffered from a deficit in adaptive functioning

46

and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." [Doc. 10 at 23-24; Doc. 14 at 8-9]. However, Plaintiff fails to proffer any authority to suggest that such bootstrapping is permissible—let alone required—and the Court also knows of none. [Doc. 10 at 23-24; Doc. 14 at 8-9]. Indeed, in the Court's experience, it is not at all unusual for an ALJ to craft an RFC more restrictive than his or her limitations findings require, simply to give the claimant the benefit of the doubt or, likely, to provide some allowance for harmless error.

To Plaintiff's credit, it does appear that the ALJ erred in determining that Plaintiff did not have a deficit in adaptive functioning, as he credited the medical opinions restricting Plaintiff to limited basic interaction with the general public and coworkers, yet found that Plaintiff "d[id] not appear to have deficits in functional adaptations." [*See* R17-18, 20-21, 318, 341].[12] Nevertheless, to the extent that the ALJ

---

[12]     It is also arguable that Plaintiff's reading difficulties may have constituted a deficit in adaptive functioning. However, while there is certainly evidence sufficient to support such a determination, the ALJ's decision also cites substantial evidence to the contrary—including Plaintiff's GED and ability to read the newspaper well enough to understand a sports article. [*See* R17]. Although the ALJ's decision does not expressly refer to the evidence, it also bears noting that in an adult function report, Plaintiff indicated that he could follow written instructions well and reported "reading" as his hobby. [R198-99]. Plaintiff's mother also stated that Plaintiff could follow basic written instructions. [R244]. Thus, the undersigned finds that there was substantial

did in fact err in making this adaptive-functioning determination, the error is harmless, as Plaintiff has failed to show that he had "a physical or other mental impairment imposing an additional and significant work-related limitation of function."

As Plaintiff points out,[13] in the absence of a requirement for a specific degree of limitation, the Eleventh Circuit has held that even a minimal limitation will satisfy a listing's requirement. *See Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991) (holding that "an obese claimant need present no more than evidence of minimal degenerative joint changes to meet the required showing of 'X-ray evidence of arthritis' under Listing 10.10(A)"). Here, however, the Social Security regulations expressly provide that, for the purposes of Listing 12.05C, if an "additional impairment" is not "severe" as defined in 20 C.F.R. §§ 404.1520(c) and 416.920(c), the Commissioner "will not find that the additional impairment(s) impose[] 'an additional and significant work-related limitation of function.' " 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A. Thus, Plaintiff was required to demonstrate that his "physical or other mental impairments" were "severe" in order to satisfy the second portion of Listing 12.05C.

_____

evidence to support a determination that Plaintiff did not suffer from reading difficulties amounting to a deficit in adaptive functioning.

[13]       [Doc. 10 at 14 & n.49].

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C (requiring "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a *physical or other mental impairment imposing an additional and significant work-related limitation of function*") (emphasis added)); *cf. Gibbs* ex rel. *Barris v. Barnhart*, 130 Fed. Appx. 426, 430 (11th Cir. May 5, 2005) (per curiam) (holding that if an additional impairment is not "severe" as defined in 20 C.F.R. § 416.924, it cannot impose an additional and significant limitation of function satisfying listing 112.05D).

Curiously, Plaintiff fails to allege what mental impairment other than his intellectual functioning may have limited his ability to interact appropriately with the public and coworkers. [*See* Doc. 10 at 23-24; Doc. 14 at 8-9.  Nor does he raise any argument that his calluses and whiplash constituted severe impairments or continued to impose significant work-related limitations of function.  [*See* Doc. 10 at 23-24; Doc. 14 at 8-9].  It is also noteworthy that Plaintiff chose not the challenge the ALJ's reliance on evidence that Plaintiff's alleged physical impairments had resolved, [R19 (referencing Plaintiff's release from treatment for whiplash and low-back pain), 20 (citing Dr. Ross's notation that Plaintiff's foot condition had improved)]. [*See* Doc. 10 at 23-24; Doc. 14 at 8-9].  Thus, as the Commissioner points out, because Plaintiff did not challenge the ALJ's finding at step two that Plaintiff's severe mental

49

impairments were limited to intellectual-functioning impairments and that Plaintiff's alleged physical impairments due to calluses and whiplash did not cause more than minimal limitations in the ability to perform basic work related activities, he has waived any argument that he suffered from "a physical or other mental impairment imposing an additional and significant work-related limitation of function." [*See* Doc. 13 at 18-19 (citing *Sanchez v. Comm'r of Soc. Sec.*, 507 Fed. Appx. 855, 856 n.1 (11th Cir. Feb. 8, 2013) (per curiam) (noting that claimant waived certain arguments by not expressly challenging the ALJ's findings); *Outlaw*, 197 Fed. Appx. at 827 n.3 (finding that the plaintiff waived an issue by failing to elaborate on his argument or provide a citation to authority regarding the argument))].

For all of these reasons, the Court concludes that Plaintiff has failed to show any basis for ruling that the ALJ erred in his determination that Plaintiff's condition does not meet Listing 12.05C.

## VII.   CONCLUSION

The ALJ erred by failing to reconcile the RFC with his assignment of "significant weight" to the reviewer's opinions that Plaintiff is moderately limited in his ability to sustain an ordinary routine without special supervision.  Thus, the final decision of the

50

Commissioner is hereby **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this order and opinion.

The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED**, this the 22nd day of September, 2015.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

51